IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARL WILLIAM BASS, | ) |
| *Plaintiff,* | ) No. 23 C 354 |
| v. | ) Judge Virginia M. Kendall |
| JOHN BRANNEN and NETWORK PROPERTY MANAGEMENT, | ) |
| *Defendants.* | ) |

## MEMORANDUM OPINION AND ORDER

Carl Bass is a disabled man who has been renting from Defendants John Brannen and Network Property Management for several years. During this time, Bass alleges that he repeatedly asked Defendants to accommodate his disability, but they failed to do so. Finally, in mid-2022, Brannen decided to not renew Bass's lease, a decision that Bass believes is motivated by discriminatory intent. Defendants now move to dismiss Bass's claims under the Federal Housing Act ("FHA"), 42 U.S.C. §§ 3604(f), 3617, and Title III of the American Disabilities Act ("ADA"), 42 U.S.C. § 12182. (Dkt. 55). For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.[1]

### BACKGROUND

Carl Bass suffers from a disability called chronic fatigue syndrome ("CFS"). (Dkt. 51 ¶ 1). Around mid-June 2019, he inquired about renting apartment A in a building owned and managed

---

[1] Bass filed an amended complaint, (Dkt. 61), after Defendants moved to dismiss his earlier complaint, (Dkt. 51). Because the Court has not granted leave for Bass to file an amended complaint, the Court declines to consider his later complaint.

1

by John Brannen. (*Id.* at ¶ 2). In the initial meeting, Bass told Brannen about his CFS and Section 8 rental assistance. (*Id.*) About a month later, Bass met with Brannen again to discuss his disability and the accompanying nervous system symptoms. (*Id.* at ¶ 3). Bass asked Brannen to accommodate his disability by requesting Brannen to talk with the tenant in apartment B about muffling the sound of violin playing. (*Id.*) On August 1, 2019, the parties signed the lease. (*Id.* at ¶ 5).

On November 13, 2019, Bass met with Brannen and his brother to discuss the tenant in apartment B who was playing loud screeching sounds on the violin, triggering in Bass heart palpitations, hand tremors, and panic attacks. (*Id.* at ¶ 6). According to Bass, Brannen was not going to "accommodate" until Brannen's brother commented that it was the tenant's boyfriend in apartment B who was playing the violin. (*Id.*) Only then, Brannen said that he would email the tenant in apartment B and ask the boyfriend to play the violin in the bedroom with the door closed. (*Id.*) On November, 22, 2019, Bass sent a letter to Brannen stating that the violin player had not moved to the back porch or back bedroom when playing. (*Id.* at 29). Eventually, the violin playing subsided. (*Id.* at ¶ 6).

Separately, in November 2019, the tenant in apartment D, K. Oblazny, considered getting a dog and Brannen directed Oblazny to talk with Bass first. (*Id.* at ¶ 7). Oblazny assured Bass that she would be putting the dog in daycare during the day. (*Id.*) Fast forward to July 2022, Oblazny allegedly left her dog alone in the apartment for four consecutive days, where the dog would bark and howl for three hours. (*Id.*) Bass subsequently left a note on Oblazny's door and called the police twice to alert Oblazny to her barking dog. (*Id.*) The dog has since quieted down by "95%." (*Id.*)

On January 8, 2021, Bass received a letter from Brannen about Bass's noise complaints. (*Id.* at 30). The letter stated that Bass's disability involved acute sensitivity to noise, with people

"taking showers, baths, making meals, walking in the apartment and outside halls, talking, etc." possibly triggering Bass's disability. (*Id.* at 30). Brannen offered two possible solutions: (1) purchase a pair of noise cancelling headphones or (2) move to a more private residence. (*Id.*) Bass took umbrage with several allegedly misleading facts in the letter. Bass stated that he did not suffer from acute sensitivity to noise and had no problem with the run-of-the-mill sounds associated with apartment buildings. (*Id.* at ¶ 8).

A few months later, in April 2021, an individual named C. Choate moved into apartment E, directly below Bass's unit. (*Id.* at ¶ 9). According to Bass, Choate "quickly installed 3 audio speakers very close to his ceiling" and blasted sound from the speakers. (*Id.*) Bass stomached the sound for months before calling the police. (*Id.*) Bass allegedly did not reach out to Brannen for accommodation because Bass received "one move out letter already." (*Id.*) Instead, Bass wrote a letter to Choate explaining his CFS disability, but Choate allegedly did not care. (*Id.*) Choate subsequently moved out of the building, a decision that Brannen allegedly blames Bass for. (*Id.*)

After Choate moved out, a new tenant, M. Berger, moved into apartment E, and, allegedly, began to play loud TV sounds from her sound system. (*Id.* at ¶ 10). Bass allegedly called Brannen six times to speak with Berger about lessening the bass and sound. (*Id.* at ¶ 18). Separately, Bass called the police on Berger to ask her to turn down the TV volume. (*Id.* at ¶ 11). On November 20, 2021, Brannen sent another letter to Bass. (*Id.* at 32). In it, Brannen explained that he told Berger about Bass's hypersensitivity to noise and medical ailments. (*Id.*) Berger explained that she usually goes to bed between 9:00 and 10:30 PM, sets her TV sound to a low setting of "5," and the TV automatically turns off. (*Id.*) Again, Brannen offered some options to Bass: (1) splitting the cost to soundproof Bass's apartment; (2) wearing noise cancelling headphones; or (3) if the issues persist, to seek other housing arrangements. (*Id.* at 32–33). Brannen stated these options were only

suggestions and did not want Bass to take them the wrong way. (*Id.* at 33). Brannen ended the letter by asking how Bass would like to proceed or if he had any other ideas. (*Id.*)

In response, Bass again clarified that he was not "hypersensitive to noise." (*Id.* at ¶ 10). According to Bass, Berger blasted TV sounds until 2:30 AM at high setting of "70." (*Id.*) Bass gave Brannen other suggestions, like having Berger wear earphones when watching TV. (*Id.*) Brannen rejected that idea because he could not force Berger to wear earphones. (*Id.*) Bass also retorted that Brannen similarly had issues with noises coming from Berger's apartment. (*Id.* at 34). As Bass alleges, when Berger's dog was barking all day long, it also got on Brannen's nerves and Brannen had to intervene with Berger to quiet the dog. (*Id.*)

Bass also contacted Network Property Management, a building management company hired by Brannen, about the noises from Berger's apartment. (*Id.* at ¶ 17). Rose Gillece, an employee with Network, agreed to contact Berger about Bass's complaint. (*Id.*) But Berger did not lower the volume. (*Id.*) Bass called Gillece several more times and Gillece replied "We call her and tell her to turn it down and the next day, she turns it back up. We're not babysitters." (*Id.*) On another occasion, Bass called Gillece several times about Oblazny's dog barking, in which Gillece replied "This doesn't bother anybody else Carl. It's always you, you, you!" (*Id.*)

On December 22, 2021, Brannen sent Bass a third letter, stating that the other tenants in the building did not want to receive letters from Bass because they found them "very disturbing." (*Id.* at 34). Brannen was allegedly referring to several letters Bass sent to two female tenants. *Id.* at ¶ 11). In total, Bass sent several letters to K. Oblazny of apartment D: (1) a note about the power being knocked out; (2) clearing up a misunderstanding; (3) a note about her barking dog; (4) a copy of Cook County laws about animal care; and (5) a legal letter stating that Bass would sue Oblazny if she continued to slander him. (*Id.* at ¶¶ 7, 11) To Berger, Bass sent a legal letter

4

explaining his disability to her. (*Id.*) Brannen again offered several possible accommodations, including ear plugs, noise cancelling headphones, or assistance with soundproofing the apartment. (*Id.* at 34). Worried about the severity of Bass's condition, Brannen suggested that Bass invites his case worker to visit the apartment and find ways to make the environment less triggering. (*Id.*)

In a letter sent dated January 7, 2022, Bass told Brannen that he did not have a sensitivity to all sounds, just some sounds. (*Id.* at 35).

In February 2022, Brannen slipped a key and a note under Bass's door and asked Bass to check out apartment G. (*Id.* at ¶ 12B). But Bass could not afford apartment G's higher rent. (*Id.*) In late May 2022, Brannen called Bass and told him "If you don't take rear Apt. G, I'm not going to renew your lease on Apt. A" and "This is not a convalescent home." (*Id.* at ¶ 12A). On June 27, 2022, Bass received a 60-day notice that Brannen would not be renewing his lease. (*Id.*) Brannen also allegedly told the Housing Authority of Cook County that Bass was moving to apartment G and the Housing Authority stopped providing rent for Bass's apartment A. (*Id.* at ¶ 12B). As a result, Bass owed $3,546 in rent. (*Id.*) Bass further alleges that Brannen offered apartment G to Berger who declined to accept the lease, yet Berger did not "get a non-renewal of her Apt. E lease" and was allowed to enter a new lease with apartment F. (*Id.*)[2]

---

[2] A defendant's motion to dismiss is in response to the plaintiff's factual allegations in the complaint. Bass has filed two letters, which the Court construes as responses to Defendants' motion to dismiss, where he alleges additional allegations like (1) the fire alarm going off unnecessarily; (2) the weak stream of water coming from his bathroom sink; (3) a "rocking" toilet; (4) "improperly installed bathroom floor"; (5) malfunctioning refrigerator. (*See generally* Dkts. 60, 66). He also adds additional allegations against Defendant Network Property Management. (*See generally* Dkt. 60). But Bass failed to allege any of these facts in his amended complaint. (Dkt. 51). It is "an axiomatic rule that a plaintiff may not amend his complaint in his response brief." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011). Thus, the Court will disregard these additional factual allegations in its opinion.

**LEGAL STANDARD**

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting Fed. R. Civ. P. 8(a)(2)). Thus, "a plaintiff must allege 'enough facts to state a claim that is plausible on its face.'" *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "To be sure, although a plaintiff 'need not plead detailed factual allegations to survive a motion to dismiss, she still must provide more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action for her complaint to be considered adequate.'" *Etheridge v. Hudson Grp. Retail, LLC*, 2022 WL 375556, at *4 (N.D. Ill. Feb. 8, 2022) (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Allen*, 41 F.4th at 850 (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). The Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.* (citing *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016)).

**DISCUSSION**

**I.      Title III of the ADA**

The Court will quickly dispense with Bass's ADA claim. Bass argues that Defendants violated the ADA because they discriminated against him based on his disability. Title III of the ADA covers private entities and prohibits discrimination "on the basis of disability…of any place of public accommodation." 42 U.S.C. § 12182(a). The statute lists out several examples of private entities who are considered public accommodations, like an inn, motel, restaurant, or museum. *See*

6

42 U.S.C. § 12181(7). So to state a plausible Title III violation under the ADA, Bass must allege that the place of his discrimination is a place of public accommodation. *See Mohammed v. DuPage Legal Assistance Found.*, 781 F. App'x 551, 552 (7th Cir. 2019).

Bass has failed to do so. Rather, it appears that his unit is part of a private apartment building that Brannen and his family have owned "for many generations." (Dkt. 51 at 30). Thus, Bass's apartment unit does not fall under the ADA's definition of public accommodation. *See, e.g.*, *Coe v. Cross-Lines Ret. Ctr., Inc.*, 645 F. Supp. 3d 1126, 1130 (D. Kan. 2022); *Henley v. Am. Homes 4 Rent Properties Ten, LLC*, 2021 WL 1293831, at *3 (N.D. Ill. Apr. 7, 2021); *Torrence v. Advanced Home Care, Inc.*, 2009 WL 1444448, at *5 (N.D. Ill. May 21, 2009); *Champlin v. Sovereign Residential Servs.*, 2008 WL 2646627, at *3–4 (M.D. Fla. June 26, 2008) (finding that ADA "only regulates non-residential facilities"). So Bass's Title III violation under the ADA is dismissed.

## II. FHA § 3604(f)

A plaintiff with disability may prove an FHA violation by showing: (1) disparate treatment, (2) disparate impact, or (3) a refusal to make a reasonable accommodation. *Nikolich v. Vill. of Arlington Heights*, 870 F.Supp.2d 556, 562 (N.D. Ill. 2012). Bass's complaint does not implicate a disparate impact claim because he does not allege that Defendants imposed a "facially neutral policy [that] unjustifiably falls more harshly on a protected group than on others." *Id.* at 563–64. Therefore, the Court will focus on disparate treatment and failure to accommodate.

### A. Disparate Treatment

The FHA prevents Defendants from "discriminat[ing] in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter." 42 U.S.C. § 3604(f)(1)(A). To state a disparate treatment claim, Bass needs to show

7

intentional discrimination, "provable via either direct or circumstantial evidence." *Nikolich*, 870 F. Supp. at 562 (citation omitted).

Here, Bass has stated a possible disparate treatment violation—Brannen's declination to renew Bass's lease. To be sure, Brannen's alleged statement—"If you don't take rear apt. G, I'm not going to renew your lease on apt. A"—makes little sense unless Bass intended to lease both apartments. But the gist is there—Brannen had no intention of renewing Bass's lease for apartment A. Therefore, Brannen offered Bass a Hobson's choice: either (1) lease apartment G at rental price that Bass could not afford or (2) leave the building. Only one option was feasible. And Bass has alleged sufficient facts to suggest that Brannen's motivation could be discriminatory in nature. Discriminatory intent can be inferred from "suspicious timing, ambiguous statements, [or] behavior toward or comments directed at others in the protected group" and "evidence that others similarly situated to plaintiff, other than in the characteristic on which the defendant is forbidden to base a difference in treatment (e.g., race), received systematically better treatment." *H.O.P.E., Inc. v. Lake Greenfield Homeowners Ass'n*, 330 F. Supp. 3d 1105, 1115 (N.D. Ill. 2018) (citation omitted).

For one, when denying the lease renewal, Brannen's comment that his building was not a "convalescent home" hints at Bass's disability as a factor in Brannen's decision. But even more telling is the disparate treatment towards Bass versus Berger. Brannen also offered Berger the lease for apartment G but she declined to accept it. Yet, Berger was not forced to leave the building. She had the option to stay in apartment E or sign a new lease for apartment F. And as Bass alleges, the only difference between the two is his disability. Defendants assert that they do not need a "good cause" to deny Bass's renewal. Perhaps, but they cannot deny renewal for a discriminatory one, like on Bass's disability. Defendants are free to put forth evidence of a valid, non-discriminatory

8

reason for denying Bass's renewal at later stages of litigation, but at the pleading stage, Bass's allegations pass muster for a disparate treatment violation.

Defendants also assert that Bass has failed to allege any disparate treatment or discrimination by Network Property Management. Indeed, Bass focuses much of his Complaint on Brannen's actions and decision to not renew Bass's lease. Thus, Network Property Management is dismissed as a defendant.

### B. Failure to Accommodate

Section 3604(f)(2) prevents discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person." 42 U.S.C. § 3604(f)(2)(A). The statute defines discrimination as including "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* at § 3604(f)(3)(B).

To establish a *prima facie* case for failure to accommodate, "the plaintiff must show that: (1) [he] suffers from a disability or is associated with someone with a disability; (2) defendant knows of the disability or reasonably should be expected to know of it; (3) an accommodation may be necessary to give the plaintiff an equal opportunity to use and enjoy the dwelling; and (4) the defendant refused to make a reasonable accommodation." *Stevens v. Hollywood Towers & Condo. Ass'n*, 836 F. Supp. 2d 800, 808 (N.D. Ill. 2011) (citation omitted).

At its core, the third element asks: "[will] the desired accommodation…ameliorat[e] the effects of the [plaintiff's] disability"? *Selyutin v. Bd. of Directors of Skokie Garden Condo. Ass'n*, 2019 WL 13247481, at *2 (N.D. Ill. Dec. 18, 2019) (quoting *Bronk v. Ineichen*, 54 F.3d 425, 429 (7th Cir. 1995)). Thus, "courts consider whether the defendant adopted 'rules, policies, practices,

9

or services…that hurt handicapped people *by reason of their handicap*, rather than hurt them solely by what they have common with other people.'" *Id.* (quoting *Hemisphere Bldg. Co. v. Vill. of Richton Park*, 171 F.3d 437, 440 (7th Cir. 1999) (emphasis original)). In other words, "the plaintiff must show that, 'but for [his] disability, he would have been able to access the services or benefits desired.'" *Id.* (quoting *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 754 (7th Cir. 2006)).

Bass fails to allege sufficient facts to show that his disability is the but-for reason as to why he could not access "the services or benefits desired"—quiet enjoyment of his apartment. Bass repeatedly states that his disability does not involve sensitivity to noises generally. To him, run-of-the-mill sounds associated with close living quarters—water running or walking in the hallway—are fine. What Bass objects to are loud, insufferable noises, like a dog barking and howling, a TV volume set at 70 blasting sound at 2:30 AM, screeching violin noises, and the heavy bass of TV stereos. But those noises would prevent any tenant—disabled and non-disabled alike—from "us[ing] and enjoy[ing his] dwelling." *Poursaied v. Reserve at Research Park LLC*, 379 F. Supp. 3d 1182, 1189 (N.D. Ala. 2019); *see, e.g.*, *Selyutin*, 2019 WL 13247481, at * 3 (finding that the "break-ins, vandalism, and theft" affected all the residents, so plaintiff's disability was not a but-for cause of his inability to access his condo). Case in point, when Berger's dog was "barking its head off," the noise also interfered with Brannen's enjoyment of his home. (Dkt. 51 at 34).

Bass counters by stating that the loud noises trigger his disability's symptoms like heart palpitations and hand tremors, but Bass fails to demonstrate that, but for those symptoms, he would have enjoyed his dwelling. Or, putting it another away, even if Bass did not suffer from CFS, he would still find the violin screeching, TV sound blasting, and dog howling unbearable because any tenant would find it unbearable. The Seventh Circuit's *Good Shepherd Manor Foundation, Inc. v.*

10

*City of Momence* is helpful here. 323 F.3d 557 (7th Cir. 2003). In that case, the plaintiff, under a failure-to-accommodate theory, argued that the city's ad hoc decision to cut the water supply to a plot of land, thus shutting down care facilities for disabled adults, hurt those disabled adults "by reason of their disability" because those residents were denied the recognized benefit of group living. *Id.* at 562. The court disagreed, stating that the water shut off forced every resident, disabled or not, to relocate. *Id.* (noting that "[c]utting off water prevents anyone from living in a dwelling, not just handicapped people"). While disabled adults suffered from additional harms—forced to relocate and denied the benefit of group living—the water shut off denied everyone their housing rights. Or, putting it another way, even if the adults were not disabled, they would still have to leave their homes.

Thus, the Court fails to see how the noises prevented Bass from using or enjoying his apartment because of his CFS as opposed to the fact that any person of normal sensitivity to sound would find the alleged ruckus egregious and be deprived of their quiet enjoyment. *See Wis. Cmty.*, 465 F.3d at 754. Therefore, Defendants' motion to dismiss the failure-to-accommodate claim is granted.

**III.**     **FHA § 3617**

Lastly, Bass alleges that he faced intimidation, fear, and interference while he was living at apartment A. To succeed on this claim, Bass must show that: (1) he is a protected individual; (2) he has engaged in the exercise of his fair housing rights; (3) Defendants threatened, coerced, intimidated or interfered with Plaintiffs on account of their protected activity under the FHAA; and (4) Defendants were motivated by a desire to discriminate. *Bloch v. Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009).

11

As discussed, Bass has alleged sufficient facts for the Court to infer some discriminatory intent when Brannen denied renewal of his lease. So the central question is whether Bass's allegations rise to the level of threatening, coercive, intimidating, or interfering as contemplated by § 3617. Many § 3617 cases discuss egregious facts like firebombing, cross-burning, or threats and acts of physical violence. *See Walton v. Claybridge Homeowners Ass'n, Inc.*, 2004 WL 192106, at *6 (S.D. Ind. Jan. 22, 2004) (collecting cases). But nothing within the language of § 3617 limits its application these violent extremes. *See Halprin v. Prairie Single Fam. Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (noting cases where sexual harassment and economic pressure rose to the level of "interference" under § 3617). Indeed, adding the word "interfere" next to "coerce, intimidate, [and] threaten" reflects FHA's broad remedial purpose to prohibit a wide range of conduct. *See, e.g.*, *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, 2019 WL 5963633, at *7 (N.D. Ill. Nov. 13, 2019); *Walton*, 2004 WL 192106, at *6. But the Court is mindful that interference must be more than a "quarrel among neighbors" or an "isolated act of discrimination." *Bloch*, 587 F.3d at 783.

Here, Defendants argue that Bass has failed to allege any pattern of interference, stating that the noises Bass objects to are obnoxious to any tenant, handicapped or not. But Defendants' argument is too narrow and ignores the larger "interference" of denying Bass's right to rent. In *Bloch v. Frischholz*, the Seventh Circuit, in a hypothetical, contemplated that a plaintiff with a disability need not plead a pervasive pattern of refusals to state a § 3617 claim. The *Bloch* court posited that: "if a landlord rents to a white tenant but then threatens to evict him upon learning that he is married to a black woman, the landlord has plainly violated § 3617, whether he actually evicts the tenant or not." *Id*. at 782. Similarly, in *Metropolitan Housing Development v. Village of Arlington Heights*, the Seventh Circuit found that discriminatorily refusing to rezone could

constitute an FHA violation. 558 F.2d 1283, 1288 n.5 (7th Cir. 1977). Both cases contemplate violations where "people in the protected class would not get the housing they were seeking at all." *H.O.P.E., Inc. v. Alden Gardens of Bloomingdale, Inc.*, 2017 WL 4339823, at *8 (N.D. Ill. Sept. 29, 2017). It makes little sense to show some pattern of harassment when Defendants did more than interfere with Bass's housing rights—they severed it by denying Bass's lease renewal. *See id.* (citing *United States v. Sabbia*, 2011 WL 1900055, at *8 (N.D. Ill. May 19, 2011)). Thus, Bass's § 3617 claim survives for now.

Lastly, Network Property Management asks to be dismissed from this suit because Bass has failed to allege sufficient facts to show that Network intimidated, threatened, coerced, or interfered—with discriminatory intent—with Bass's housing rights. The only possibly relevant allegations are Gillece's comments about how the management company employees are not "babysitters" and how the noise only affects "you, you, you." But these two incidents do not rise to the level of a § 3617 claim. For one, Bass does not plead that these statements were made with any discriminatory intent. And second, Bass has not explained how Gillece's comments interfered with his housing rights. Gillece made those comments after Bass called her several times to complain about various loud noises and she had already reached out to the tenants on Bass's behalf. This exchange sounds like frustration and tension between management and tenant about how the building is run, which does not rise to the level of a § 3617 violation. *See Farrar v. Eldibany*, 137 F. App'x 910, 912 (7th Cir. 2005). Therefore, Defendants' motion to dismiss Bass's § 3617 claim is granted as to Network Property Management.

## CONCLUSION

For the foregoing reasons, the Court dismisses the Title III of the ADA claim, the failure-to-accommodate claim, and Network Property Management as a defendant in this case. Bass can continue to pursue his remaining FHA claims against Brannen.

_____
Virginia M. Kendall
United States District Judge

Date: April 2, 2024